OPINION
DUNCAN, Circuit Judge.
Following trial, the jury found Appellant Chesapeake Bay Fishing Company, L.L.C. (“Chesapeake Bay”) liable for damages to the GOLDEN NUGGET, a fishing vessel owned by Appellee Golden Nugget, Inc., captained by Appellee David Hickman, and insured by Appellee Indian Harbor Insurance Company (collectively, “GNI”). Chesapeake Bay challenges the district court’s decision permitting GNI to introduce expert opinions that Chesapeake Bay contends were not previously disclosed to it and the denial of its motion for judgment as a matter of law or a new trial. Because we conclude that the evidentiary error was harmless and that the district court properly denied Chesapeake Bay’s motion for judgment as a matter of law or a new trial, we affirm.
I.
In October 2000, GNI entered into a contract with Ampro Shipyard, owned by Chesapeake Bay, for routine repair and maintenance on the F/V GOLDEN NUGGET. On October 20, 2000, the GOLDEN NUGGET was placed on a marine railway *532 and removed from the water. In preparation for the repair work, an employee of Chesapeake Bay attempted to provide a shore power hookup to the vessel by plugging its shore power cable into a receptacle at the shipyard. When the cable was plugged in, the circuit breaker in the shore power facility tripped, as did the circuit breaker on the GOLDEN NUGGET. The shipyard employee reset the breakers and attempted to plug the shore power cable in again; the shore power circuit breaker tripped again. The shore power cable had four wires, colored white, red, black, and green, and on the third attempt an employee managed to provide shore power to the vessel by cutting the white wire. This time the breaker did not trip. Once power was connected, Captain Hickman closed the vessel cabin and departed.
Five days later, shipyard employees began welding work on the outside stern area of the GOLDEN NUGGET. Later that day, a yard employee noticed smoke coming from the cabin of the vessel, and a fire was discovered.
After the fire was extinguished, investigators found a burned appliance on a lower bunk in one of the bunk rooms. The parties later agreed that the appliance was a fan, that the fan was the source of the fire, and that the fan’s switch was in the “on” position when the fire started.
At trial, Chesapeake Bay contended that the fan had been left on and unattended while surrounded by flammable paper products. Chesapeake Bay theorized that the fan’s blades were blocked and could not turn, and the eventual heat build-up of the fan caused the paper products to ignite. GNI argued that a voltage spike caused by the initial failed shore power hookup damaged the fan. Under GNI’s theory of causation, the later voltage spiking related to the welding caused the damaged fan to spark and ignite the fire.
In a bifurcated trial, the jury found Chesapeake Bay liable for negligence, breach of implied warranty of workmanlike performance, and breach of a bailment contract. The court entered a final judgment against Chesapeake Bay in the amount of $425,558.
During trial, Chesapeake Bay raised two objections to the admission of testimony by Frederick West, GNI’s expert witness, that form the basis of this appeal. First, Chesapeake Bay objected to the admission of West’s expert opinion that voltage spiking caused the fire. Chesapeake Bay argued that the opinion was not disclosed in West’s Expert Report as required by Fed. R.Civ.P. 26.[1] Second, Chesapeake Bay objected to the admission of West’s testimony regarding the existence of a thermal cutout on the fan that sparked the fire. A thermal cutout causes an appliance to turn off in the presence of heat or excessive current, but is not affected by excessive voltage. Confirmation of a cutout therefore undercut Chesapeake Bay’s theory of causation. The district court overruled both objections.
After the entry of judgment, Chesapeake Bay made a timely motion for judgment as a matter of law or alternatively for a new trial, again arguing that West’s causation opinion was improperly admitted. The district court denied this motion, finding that West’s expert testimony tracked information properly disclosed in his Expert Report. Additionally, the district court found that even if the testimony varied slightly from the disclosed information, that variation was harmless. The *533 district court further ruled that West’s testimony about the thermal cutout was elicited during GNI’s rebuttal ease, and that the use of the undisclosed opinion on rebuttal did not violate Rule 26.
II.
A district court’s evidentiary rulings, including rulings on the admissibility of expert testimony, are reviewed for an abuse of discretion. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). An abuse of discretion occurs when a district court makes an error of law. See United States v. Barile, 286 F.3d 749, 753 (4th Cir.2002).
A.
We turn first to the more troubling issue of the admission of testimony about the existence of a thermal cutout. GNI stipulates that West examined the physical remains of the fan the day before the trial and formed the opinion at that time that evidence of such a thermal cutout existed. GNI did not disclose this new opinion to Chesapeake Bay.
Fed.R.Civ.P. 26(e)(1) imposes a duty on parties to supplement disclosures if the information disclosed is later found to be incomplete or incorrect. Further, Rule 26 requires disclosure of all expert opinion testimony. See Fed.R.Civ.P. 26(a)(2)(B) (“The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor .... ” (emphasis added)).
There is no basis in the Rule for distinguishing disclosures of testimony to be used on direct examination or in rebuttal. The district court erred in holding that the disclosure of expert testimony is not required when it is offered in rebuttal. We turn, then, to a consideration of whether the error is harmless.[2]
We base an analysis of harmless error on the five factors in Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir.2003), considering: (1) the level of surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party’s explanation for its failure to disclose the evidence.
Chesapeake Bay argues that it was taken by surprise when GNI offered West’s opinion about the existence of a thermal cutout. Based on a review of the discovery in this case, while we do not doubt that Chesapeake Bay was surprised by West’s testimony regarding physical evidence of the existence of a cutout, it was on notice that the existence of a thermal cutout was a continuing issue for GNI. During his deposition taken two weeks before trial, William Harris, Chesapeake Bay’s electrical expert, was asked by GNI’s counsel whether it was possible that the fan had a thermal cutout. Additionally, during the deposition of joint forensic expert Dr. Richard Martin, he opined that “[t]his device did not have a thermal cutout” and that “[glenerally [a thermal cutout] will survive a fire.” See Martin Dep. at 134-35. In fact, the entire Martin deposition, taken just a week before trial, centered around verifying that the appliance was a fan, and whether there was evidence of a thermal cutout. Perhaps most telling, during the deposition of West taken two weeks before trial, counsel for Chesapeake Bay questioned him extensively about the existence of a thermal cutout. West testi *534 fíed that “every fan I’ve looked at has a thermal cutout in it.” When asked why Dr. Martin found no thermal cutout, West responded, “They didn’t look good enough [sic] or it’s burned out....” West Dep. at 61. Thus, although Chesapeake Bay was surprised when West testified that he found evidence of a thermal cutout, it was clearly on notice of his position that one existed.
With respect to the second factor, Chesapeake Bay argues that it lacked the ability to cure the surprise because it had “no rebuttal or response.” Br. at 16. To the contrary, we find Chesapeake Bay had not only the ability to cure any surprise, but also the opportunity. Chesapeake Bay had expert testimony available to it opining that there was no “physical evidence of a thermal cutout. At trial, GNI introduced a deposition summary of the findings of joint forensic expert Martin, who analyzed the remains of the fan.[3] The summary included the fact that Dr. Martin “did not find any signs of a thermal cutout, but acknowledged that does not mean that the fan did not have a thermal cutout.” Since Dr. Martin was a joint expert, Chesapeake Bay also had access to his opinion that “[t]his device did not have a thermal cutout” and that “[generally [a thermal cutout] will survive a fire.” Martin Dep. at 134-35. Chesapeake Bay made no effort to have this testimony admitted. At the conclusion of the deposition summary presented by GNI, the district court specifically asked Chesapeake Bay if it had any cross summary. J.A. 264. Chesapeake Bay declined the opportunity.
The conclusion that Chesapeake Bay had the ability to cure the surprise but failed to capitalize on opportunities to do so is reinforced by three other instances during trial. Chesapeake Bay’s electrical expert, Harris, had testified during trial that “[t]here is nothing that indicates that [the fan] ever had a thermal cutout.” J.A. 324. Nevertheless, when GNI recalled West to testify about the existence of the thermal cutout in rebuttal, Chesapeake Bay declined the opportunity to cross-examine West. Further, after GNI rested its case, the court asked Chesapeake Bay, “Any surrebuttal?” J.A. 340. Chesapeake Bay also declined this opportunity. Finally, immediately after this, the court released the jury for the day but kept the attorneys in order to hear motions regarding jury instructions. Chesapeake Bay did not ask to be heard on the issue of surprise, and at no time asked for a continuance or extended recess in order to afford it the opportunity to cure the surprise.
As to the third factor, the district court’s willingness to hear further evidence from Chesapeake Bay is indicative that curative testimony would not have disrupted the trial. To the contrary, the district court, acting sua sponte, offered Chesapeake Bay the opportunity to introduce a cross summary of Dr. Martin’s deposition, and offered Chesapeake Bay the opportunity for surrebuttal following West’s testimony.
With respect to the fourth factor, the existence of a thermal cutout in the fan was important to Chesapeake Bay’s theory of causation for the reasons described above. The existence of a cutout weakened its claim that heat build up caused the fire.
Finally, we find the excuse offered by GNI for its failure to disclose to be supported by the facts in this case. GNI contends that it believed the fan remains were of no further importance after its *535 first examination, and “simply neglected to retrieve the fan from Martin until the week before trial.” Br. at 16. This explanation is supported by the transcript of the Martin deposition, taken one week before trial. Counsel for GNI told Dr. Martin, “I’m going to give you an address and ask you to Fed-Ex [the fan remains] down to me so that we can have it for use at trial' next week.” Martin Dep. at 16.
Confirmation of the existence of a thermal cutout surprised Chesapeake Bay at trial, a result Rule 26 is designed to avoid. Although we do not find that GNI acted in bad faith, that does not excuse its failure to notify Chesapeake Bay immediately upon its discovery of what it believed to be the remains of the thermal cutout. Further, our consideration of the fourth factor weighs in favor of Chesapeake Bay’s claim; the evidence in question was certainly important to its theory of causation.
On the other hand, Chesapeake Bay was aware of Mr. West’s contention that such a cutout existed, and the fan was in the possession of Dr. Martin until the week before trial. More significantly, however, Chesapeake Bay failed to avail itself of any of the opportunities that existed to cure the effect of the surprise. The district court offered Chesapeake Bay an opportunity for surrebuttal. Chesapeake Bay declined, even though its own expert was available to testify to the contrary. Dr. Martin, who had the fan in his possession until the week before trial, opined that such a cutout did not exist, and his deposition containing that testimony had been entered into evidence. Chesapeake Bay did not request a recess or a continuance to seek his testimony. It made no attempt to mitigate the effect of the surprise. Weighing these factors, we conclude that admitting the undisclosed expert testimony concerning the evidence of a thermal cutout on the fan constituted harmless error.
B.
Chesapeake Bay’s second issue on appeal is whether the district court erred when it allowed West to testify that excessive voltage caused the fire. Chesapeake Bay alleges that- this theory of causation was not disclosed in West’s Expert Report and must therefore be excluded pursuant to Rules 26(a)(2)(B) and 37(c)(1).
On October 25, 2002, GNI delivered West’s Expert Report to Chesapeake Bay. This Report consisted of (1) his Investigative Report, (2) standard shipyard regulations and information, (3) National Electrical Code Requirements for Commercial Wiring, and (4) a letter from West to GNI’s counsel, responding to the report of Chesapeake Bay’s electrical expert Harris. On January 3, 2003, Chesapeake Bay filed a motion in limine, seeking to exclude West’s opinions because Chesapeake Bay contended that West was unqualified as an expert, and that he failed to disclose his opinions in his Expert Report. The district court granted in part and denied in part this motion. The court held that West’s expert testimony would be limited to what was disclosed in his Expert Report, but Chesapeake Bay’s motion to exclude West’s testimony was denied as untimely.
Chesapeake Bay contends that GNI originally attributed the fire solely to a voltage spike created by the absence of a ground in connection with the welding work. Therefore, Chesapeake Bay argues, the theory that voltage spiking, unrelated to the existence or absence of a ground during the welding work, caused the fan to burn up and ignite the fire was undisclosed and therefore inadmissible.
We agree with the district court’s finding that West’s report did provide notice that voltage spiking would be an issue at *536 trial, although it could have been more clearly delineated.[4] For instance, in his Report, West stated, “[T]he ballast did receive a voltage spike ... [the blown ballast] was not the starting point of the fire but was a good indication of voltage spiking.” He wrote that “voltage was circulating through the ships [sic] hull with a floating return path, making it unstable. ... The change in ARC’s by the welder provided voltage spikes throughout ships [sic] electrical circuits and approximately 1 hour later the fire was found.” He further stated, “The spike that caused the heater/appliance to create a spark was a high voltage spike.... The culprit was voltage not current.... Current causes breakers to trip, excessive voltage just burns equipment out due to dielectric breakdown.” In West’s letter in response to Harris’ Report, which was included in West’s Expert Report, he stated, “I disagree with the findings and feel [voltage spiking] is possible cause of damage [sic].” West further stated, “[That a voltage spike should not have any effect on equipment downstream] is unknown,” and”[e]very ballast I looked at was blown which tells me that excessive voltage was cause [sic] of any electrical/electronics equipment defects.” In response to Harris’ contention that excessive current caused the fan to ignite, West stated, “If rotor was stopped [sic], excessive current would be drawn. Breakers would have tripped. The external wires to this appliance showed no signs of wire melting inside out. But we know we had excessive voltage by testimony and evidence of blown ballast.” J.A. 650-78.
We agree with the district court’s conclusion that while GNI’s theory of causation could have been articulated more definitively, it was generally disclosed in West’s Expert Report. Thus, the district court did not abuse its discretion in allowing the testimony.
C.
Our conclusion as to the admissibility of GNI’s causation testimony controls our analysis of Chesapeake Bay’s contention that it was entitled to a directed verdict or a new trial. Because we find West’s opinion to be admissible, we conclude that there was sufficient evidence for the jury to find Chesapeake Bay liable. Further, the district court did not abuse its discretion in denying the motion for a new trial in the interest of justice. See Atlas Food Sys. & Serv., Inc. v. Crane Nat’l Vendors, Inc., 99 F.3d 587, 594 (4th Cir.1996) (“[I]t is the duty of the [district court] to set aside the verdict and grant a new trial, if ... [1] the verdict is against the clear weight of the evidence, or [2] is based on evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.”).
III.
For the foregoing reasons, the judgment in the district court in Golden Nugget, Inc. v. Chesapeake Bay Fishing Company, L.C., No. 03-1339, is

AFFIRMED.

. See Fed.R.Civ.P. 26(a)(2)(B) (requiring disclosure of a written report prepared and signed by an expert witness, which "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor....").

. Fed.R.Civ.P. 37(c)(1) provides that information not disclosed pursuant to Rule 26 may not be used as evidence at trial "unless such failure is harmless....”

. Although Dr. Martin did not testify at trial, GNI offered a deposition summary of his testimony.

. Additionally, in a letter to Chesapeake Bay dated September 21, 2001, GNI summarized its initial position: "The cumulative effect of these inexcusable errors on Ampro's part were that the GOLDEN NUGGET experienced a series of high voltage spikes (as indicated by an internally blown light ballast on board), particularly once -Ampro began welding on the vessel, that led directly to the fire that gutted her.” J.A. 545.