STATE OF NORTH CAROLINA v. JUAN VILLEDA

No. COA03-772

(Filed 20 July 2004)

**1. Appeal and Error— disclosure of interview—discovery order not appealed**

The issue of whether the trial court erred by ordering disclosure of an Internal Affairs interview in a criminal prosecution was not before the Court of Appeals because the State did not appeal the order granting defendant's request for discovery.

**2. Evidence— hearsay—admissions by party-opponent—government agents**

The exception to the hearsay rule for admissions by an agent of a party-opponent applies to statements by government agents for the purpose of a criminal proceeding. Here, statements by a Highway Patrol trooper to attorneys and to an internal affairs officer about why he stopped Hispanics were admissible in a DWI trial because the trooper was an agent of the government and the statements concerned matters within the scope of his agency. N.C.G.S. § 8C-1, Rule 801(d)(D).

**3. Search and Seizure— DWI stop—trooper's reason not credible**

The trial court's finding that the DWI stop of a Hispanic male was unjustified and constituted an unreasonable search and seizure was supported by findings and evidence from an Internal Affairs investigation that the trooper's stated reason for the stop was not credible.

Appeal by the State from order dated 31 December 2002 by Judge Orlando F. Hudson, Jr. in Durham County Superior Court. Heard in the Court of Appeals 17 March 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General Isaac T. Avery, III, and Assistant Attorney General Patricia A. Duffy, for the State.*

*Mercedes O. Chut for defendant-appellee.*

*Seth H. Jaffe for American Civil Liberties Union of North Carolina Legal Foundation, Inc., amicus curiae.*

BRYANT, Judge.

Pursuant to N.C. Gen. Stat. § 15A-1445, the State appeals an order dated 31 December 2002 granting defendant Juan Villeda's motion to suppress and dismissing with prejudice the charge against him of driving while impaired (DWI).

At 2:40 a.m. on 11 August 2001, Trooper C.J. Carroll stopped defendant, a Hispanic male, for a seatbelt violation on Highway 70 near the Highway 15-501 intersection in Durham, North Carolina. Defendant was subsequently arrested for driving while impaired (DWI). Defendant was found guilty in district court and appealed to the superior court on 11 January 2002. On 18 April 2002, defendant filed a motion to suppress the evidence obtained during the traffic stop. The motion alleged violations of defendant's rights under the "4th, 5th, and 14th Amendments" to the United States Constitution and Article I, Section 19 of the North Carolina Constitution, stating defendant's detention had been motivated "in part by [his] race or national origin." Based on these grounds, defendant also filed a motion to dismiss the DWI charge on 17 September 2002.

At the hearing on defendant's motions, defendant presented the testimony of three attorneys who had come into contact with Trooper Carroll in the past while defending clients arrested for various driving violations. Attorney Kenneth Duke (Duke) testified that in 1998 he had represented a client charged with DWI. At the first court appearance in that case, Duke ran into Trooper Carroll in the hallway of the courthouse. Duke asked Trooper Carroll the reason for stopping his client, to which the officer replied: "[I]f they're Hispanic and they're driving, they're probably drunk." At the hearing in traffic court, Duke requested and was allowed to question Trooper Carroll about his statement in the hallway. Trooper Carroll denied having made such a statement; but when questioned by the trial court, Trooper Carroll admitted that after having seen Duke's client, a Hispanic, walk into a gas station, he parked his vehicle, turned off his lights, and just watched the gas station. Upon seeing Duke's client walk out of the gas station with beer in his arms, get into his vehicle, and start to drive away, Trooper Carroll stopped him as he was leaving the parking lot. The trial court reacted in outrage to this account of the events and dismissed the DWI charge against Duke's client.

Attorney Frances Miranda Watkins testified at the suppression hearing that she had been present at the hearing for Duke's client and

confirmed Trooper Carroll's account of the stop and the trial court's reaction thereto.

Attorney Leonor Childers (Childers) testified she had represented a client, Elvin Javier Ayala, in 2001 charged with DWI and driving with a revoked license. Prior to trial, Childers contacted Trooper Carroll by telephone to question him about his stop of her client. Trooper Carroll explained he had been driving on Miami Boulevard when he observed her client exit the Circle K store with a carton of beer in his hands. Trooper Carroll followed Childers' client, observed a broken tail-light, and ran the vehicle's tags through the computer. The computer search indicated the vehicle was uninsured. Trooper Carroll then stopped Childers' client, issued a ticket for the insurance violation and subsequently arrested him for driving while impaired. When asked by Childers if he had been staking out the Circle K, Trooper Carroll replied that on that particular occasion he had not done so, "but on other occasions he does stake out that Circle K on Miami Boulevard as well as another location on US 70" near LaMaraca, a Hispanic nightclub. Trooper Carroll told Childers he patrols those two areas of Durham "for the purpose of looking for Hispanic males." Childers further inquired, if all her client had done was exit the store with a carton of beer, why did Trooper Carroll stop him. Trooper Carroll responded: "Everyone knows that a Hispanic male buying liquor on a Friday or a Saturday night is probably already drunk"; "Mexicans drink a lot because they grew up where the water isn't good"; and that he did not care what happened in court "as long as I get them [(i.e. Hispanic males)] off the road and in jail for one night." Finally, when asked if he targets Hispanics, Trooper Carroll stated: "I'm not targeting Hispanics. Most of my tickets go to blacks." At the hearing on the charges against Childers' client, although Trooper Carroll denied having made the above statements, the trial court dismissed the charges.

Childers further testified that, following her discussion with Trooper Carroll, she began looking into his citation history. She pulled up all of Trooper Carroll's citations from 1 January 2001 to 24 March 2002, a total of 716 citations, and found that 71% of DWI citations issued by Trooper Carroll involved Hispanic individuals. Only 16% of DWI stops were of Caucasians, 9% of African-Americans, and 2% of other racial backgrounds. After Trooper Carroll came under investigation by Internal Affairs in the spring of 2002 for racial profiling, no Hispanics were cited by him for DWI violations.

In plotting the DWI stops on a map, Childers noted "two fairly concentrated areas": Area 1—the US 70-Hillsborough Road-Main Street area in Durham (within a two-to-three-mile radius of LaMaraca), and Area 2—encompassing Miami Boulevard, East Durham, Geer Street, and Holloway Street (including Circle K). According to the 2000 census data Childers reviewed, the Hispanic population in Durham County amounts to approximately 7% of the general population. However, the census data for LaSalle Street in the city of Durham, which is located in Area 1 and a quarter mile from LaMaraca, reveals a population of 32% Hispanics and 36% African-Americans.

Childers also testified that she was involved in the case *sub judice* as defendant's attorney during the district court proceeding. At the hearing before the district court, Trooper Carroll testified he had been driving behind defendant on Hillsborough Road in Durham when he noticed defendant was not wearing a seatbelt. Trooper Carroll stated the area was well lit and "he could see the seatbelt from the back."

Lieutenant Edward Vuncannon with the Highway Patrol's Internal Affairs Section testified regarding his investigation of Trooper Carroll following allegations of racial discrimination. His interviews of Trooper Carroll were recorded on tape and later transcribed. Defendant questioned Lieutenant Vuncannon about the accuracy of the questions and answers contained in the investigative interview. Lieutenant Vuncannon testified Trooper Carroll told him that in his personal opinion "Hispanics are more prone than other races to get in a car after they have been drinking" and that "[i]t's the lifestyle they live. They work Monday through Friday and . . . ." Lieutenant Vuncannon also testified that Trooper Carroll told him he was not assigned to any specific area for patrol. During the interview with Lieutenant Vuncannon, Trooper Carroll denied having made any of the statements testified to by Childers. Trooper Carroll did tell Lieutenant Vuncannon that at night, when it is dark, he cannot see into vehicles in front of him. Trooper Carroll explained: "The streetlights, . . . all this stuff going on inside the city limits of Durham, the street[]lights glare off the windows, it's almost like a mirror on the window."

In its order dated 31 December 2002, the trial court found as fact: (1) Trooper Carroll's statements testified to by the witnesses at the suppression hearing, (2) the dismissal of the 1998 and 2001 DWI charges resulting from stops made by Trooper Carroll, (3) the statis-

STATE v. VILLEDA

[165 N.C. App. 431 (2004)]

tics on Trooper Carroll's citation patterns as presented by Childers, and (4) the 2000 census data. With respect to Trooper Carroll's stop of defendant, the trial court further found:

28. Trooper Carroll stated that he cannot see inside of vehicles at night on the 2-3 mile stretch of Hillsborough Road because the light glares off the windows like a mirror.

. . . .

35. In the present case, Trooper Carroll began following [defendant] on Hillsborough Road, at night on the weekend within a mile of LaMaraca. [Defendant] was arrested on Saturday, August 11, 2001 around 2:40 am on Hillsborough Road.[1]

36. Trooper Carroll asserted that he saw that [defendant's] seat[]belt was not fastened, and that he viewed him from the back in the dark.

. . . .

38. [Defendant] is of Hispanic ethnicity, race, and national origin.

39. The Court finds based on Trooper Carroll's own statements, that the allegation that [defendant] failed to wear his seat[]belt is incredible in that Trooper Carroll was unable to see inside the vehicle before stopping the vehicle.

The trial court concluded "[t]here was no credible evidence of a particularized, reasonable, articulable suspicion to justify the traffic stop" and "the investigatory detention of [defendant therefore] violated the Fourth and Fourteenth Amendments to the United States Constitution." The trial court further concluded that defendant offered sufficient evidence to support a *prima facie* showing that Trooper Carroll engaged in racial profiling and that defendant "was stopped pursuant to intentional racially discriminatory law enforcement conduct." Accordingly, the trial court suppressed all evidence seized as a result of the stop and dismissed the DWI charge against defendant with prejudice.

The issues are whether: (I) the State preserved for appeal the question of whether the trial court erred in allowing defendant's discovery request; (II) the trial court's findings were based on impermissible hearsay; and (III) there was sufficient evidence to support

---

1. Hillsborough Road is part of US 70.

the trial court's finding that Trooper Carroll's contention of having seen defendant without his seatbelt was not credible.

## I

**[1]** The State first argues that the trial court erred in ordering the disclosure of the transcript of the Internal Affairs interview, contained in Trooper Carroll's personnel file, on which defendant relied in questioning Lieutenant Vuncannon. The State, however, did not appeal the trial court order granting defendant's request for discovery. Accordingly, the issue is not properly before this Court. *See State v. Drdak*, 330 N.C. 587, 591, 411 S.E.2d 604, 607 (1992) (holding that the evidence of the defendant's blood alcohol level was properly in the possession of the State where the district attorney filed a motion to compel disclosure of the defendant's medical records and the defendant, although he initially objected to the disclosure, did not appeal the disclosure order); *In re Foreclosure of Allan & Warmbold Constr. Co.*, 88 N.C. App. 693, 696, 364 S.E.2d 723, 725 (1988) (only if an intermediate order "involv[es] the merits and necessarily affect[s] the judgment" will a party be relieved of the burden to separately appeal from that order) (quoting N.C.G.S. § 1-278 (1987)); *see also Fenz v. Davis*, 128 N.C. App. 621, 623, 495 S.E.2d 748, 750 (1998) (absent proper notice of appeal, this Court does not acquire jurisdiction).

## II

**[2]** The State next contends that a majority of the defense evidence was based on impermissible hearsay, i.e. testimony regarding statements allegedly made by Trooper Carroll, and that the trial court erred in relying on this evidence in reaching its decision. Defendant counters that the evidence was admissible under the exception to the hearsay rule for admissions by agents of a party-opponent. *See* N.C.G.S. § 8C-1, Rule 801(d)(D) (2003).

Rule 801(d) provides:

> Exception for Admissions by a Party-Opponent.—A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) *a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship* or

(E) a statement by a coconspirator of such party during the course and in furtherance of the conspiracy.

N.C.G.S. § 8C-1, Rule 801(d) (2003) (emphasis added). The question whether Rule 801(d), identical to the Federal Rules of Evidence, *see* Fed. R. Evid. 801(d)(2) (2004), applies to statements by government agents for the purpose of a criminal proceeding has yet to be decided in North Carolina; however, the Fourth Circuit Court of Appeals has clearly resolved the issue in defendant's favor. *See United States v. Barile,* 286 F.3d 749, 758 (4th Cir. 2002) (holding that statements by an FDA employee were made "in her capacity as a government official on matters within the scope of her employment, and as such, the statements are of a party-opponent and therefore not hearsay"); *see also Rodela v. State of Texas,* 829 S.W.2d 845, 849 (Tex. App. 1992) (applying party-opponent admission exception to statements by a sergeant who was an employee of the police department and spoke concerning actions taken in his official capacity). As there is nothing in the plain language of Rule 801(d) to suggest that it does not apply to the prosecution in a criminal case, we adopt the position taken in *Barile.*

In the case *sub judice,* Trooper Carroll was a law enforcement officer and therefore an "agent or servant" of the government. *See generally* Anne Bowen Poulin, *Party Admissions in Criminal Cases: Should the Government Have to Eat Its Words?,* 87 Minn. L. Rev. 401, 467-71 (Dec. 2002) (for the proposition that the government, for purposes of a criminal prosecution, encompasses only members of the executive branch, including law enforcement, and not members of the judicial and legislative branches). In addition, Trooper Carroll's statements to Duke, Childers, and Lieutenant Vuncannon concerned matters "within the scope of his agency or employment," i.e. the motivations and circumstances surrounding his traffic stops, and were "made during the existence of the relationship." N.C.G.S. § 8C-1, Rule 801(d)(D). Accordingly, Trooper Carroll's statements were admissible as an admission by a party-opponent.

III

[3] The State also assigns error to the trial court's conclusion that "[t]here was no credible evidence of a particularized, reasonable, articulable suspicion to justify the traffic stop." We disagree.

An appellate court's review of a trial court's order on a motion to suppress "is strictly limited to a determination of whether its findings

are supported by competent evidence, and in turn, whether the findings support the trial court's ultimate conclusion." *State v. Allison*, 148 N.C. App. 702, 704, 559 S.E.2d 828, 829 (2002). Because the trial court, as the finder of fact, has the duty to pass upon the credibility of the evidence and to decide what weight to assign to it and which reasonable inferences to draw therefrom, " '[t]he appellate court cannot substitute itself for the trial court in this task.' " *Nationsbank of North Carolina v. Baines*, 116 N.C. App. 263, 269, 447 S.E.2d 812, 815 (1994) (quoting *General Specialties Co. v. Teer Co.*, 41 N.C. App. 273, 275, 254 S.E.2d 658, 660 (1979)).

With respect to the validity of traffic stops, this Court has held:

While there are instances in which a traffic stop is also an investigatory stop, warranting the use of the lower standard of reasonable suspicion, the two are not always synonymous. A traffic stop made on the basis of a readily observed traffic violation such as speeding or running a red light is governed by probable cause. Probable cause is 'a suspicion produced by such facts as indicate a fair probability that the person seized has engaged in or is engaged in criminal activity.' On the other hand, a traffic stop based on an officer's mere *suspicion* that a traffic violation is being committed, but which can only be verified by stopping the vehicle, such as drunk driving or driving with a revoked license, is classified as an investigatory stop, also known as a *Terry* stop. Such an investigatory-type traffic stop is justified if the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot.

*State v. Wilson*, 155 N.C. App. 89, 94-95, 574 S.E.2d 93, 97-98 (2002) (quoting *State v. Young*, 148 N.C. App. 462, 470-71, 559 S.E.2d 814, 820-21 (2002) (Greene, J., concurring) (citing *State v. Hamilton*, 125 N.C. App. 396, 399, 481 S.E.2d 98, 100 (1997) (officer had probable cause to stop the vehicle for the purpose of issuing seatbelt citations because he had observed both the driver and the defendant without seatbelts)) (citations omitted), *appeal dismissed and disc. review denied*, 356 N.C. 693, 579 S.E.2d 98 (2003).

Thus, if Trooper Carroll did in fact observe a seatbelt violation, he had probable cause to stop defendant. In this case, however, there was evidence stemming from the Internal Affairs interview that, due to the city lights reflecting off the car windows, Trooper Carroll could not see inside vehicles driving in front of him at night on the stretch of road on which defendant was stopped. Accordingly, there was

competent evidence to support the trial court's finding that "the allegation that [defendant] failed to wear his seat[]belt [wa]s incredible." This finding, coupled with the fact that the seatbelt violation was Trooper Carroll's sole reason for the stop in turn suffices to support the trial court's conclusion that Trooper Carroll's stop of defendant was unjustified and constituted an unreasonable search and seizure in violation of defendant's constitutional rights. Since dismissal by the trial court on this basis was proper, we need not address the State's final argument in its brief to this Court that defendant's evidence was insufficient to establish racial profiling in violation of the Equal Protection Clause.

Affirmed.

Judges McCULLOUGH and ELMORE concur.