**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 12-4701**

───────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

       v.

JOSE CAVAZOS,

              Defendant - Appellant.

───────────

**No. 12-4737**

───────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

       v.

WADE COATS,

              Defendant - Appellant.

───────────

Appeals from the United States District Court for the District
of Maryland, at Baltimore.   William D. Quarles, Jr., District
Judge. (1:09-cr-00333-WDQ-1; 1:09-cr-00333-WDQ-2)

───────────

Submitted:  June 21, 2013          Decided:  October 17, 2013

───────────

Before TRAXLER, Chief Judge, and DUNCAN and THACKER, Circuit
Judges.

───────────

Affirmed by unpublished per curiam opinion.

---

Michael D. Montemarano, MICHAEL D. MONTEMARANO, PA, Columbia, Maryland; Harry D. McKnett, Columbia, Maryland, for Appellants. Rod J. Rosenstein, United States Attorney, Peter M. Nothstein, Assistant United States Attorney, James T. Wallner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jose Cavazos and Wade Coats appeal their convictions and sentences arising out of a drug conspiracy in which they participated. Finding no error, we affirm.

I.

On April 27, 2009, Brian Shutt, Dave Clasing, E.T. Williams, Mark Lunsford, and Derke Ostrow, agents and task force officers of the Drug Enforcement Administration ("DEA"), were investigating Ronald "Truck" Brown in the Baltimore, Maryland, area. A confidential informant ("C.I.") told Shutt that Brown was distributing large amounts of heroin, and Shutt observed the C.I. call Brown and set up a meeting for a drug transaction. At approximately 6:00 that evening, Shutt witnessed the meeting, at which Brown told the C.I. that he did not have any drugs at that time but was about to obtain a large quantity.

At approximately 10:30 that evening, Shutt and other officers were surveilling Brown as he parked in the 1000 block of Eastern Avenue. They saw a Lincoln Town Car park directly behind Brown's vehicle. The officers determined that the Lincoln was a rental car, which they knew were often used by drug dealers to avoid losing their vehicles due to government seizure. A man later determined to be Wade Coats emerged from the Lincoln and spoke briefly to Brown. Brown then got out of his car, and the two men sat together for a few minutes on a

3

brick wall surrounding a tree adjacent to the Town Car. Officer Clasing then saw Brown remove a bag from his waist area and drop it into the Town Car through an open window. The officers believed that the bag contained packaged money based on its size and shape and the way that Brown held it. After Brown dropped the bag into the Lincoln, the men both returned to their respective cars and left.

Officers followed Coats, who proceeded to the Marriott Waterfront Hotel. Once there, Coats removed several bags from his vehicle, including the one that Brown had given him, and Coats walked into the hotel. About 30 minutes later, Coats emerged from the hotel, carrying nothing. Officer Clasing followed Coats as he drove to a seafood restaurant called Mo's Seafood and then to a cell-phone store.

At approximately 1:30 a.m. on April 28, 2009, officers observed Coats leave the store and walk toward the Lincoln, carrying bags. The officers approached Coats's car at that time. Identifying himself as a task force officer, Shutt asked Coats for identification, which Coats provided. Shutt also asked Coats where he had been that evening, and Coats responded that he had been at his girlfriend's house and Mo's Seafood. When specifically asked whether he had been to the Waterfront Marriott that evening, Coats denied that he had been. Although Coats had been polite and professional during the exchange to

4

that point, after denying that he had been to the Marriott, Coats began to stutter and avoid making eye contact with the agents. Shutt then asked Coats if the Lincoln belonged to him. Coats answered that he had rented it and that the rental contract was in the glove compartment, but when the officers looked there, they did not find it.

Shutt called for a K-9 officer. Fifteen minutes later, Officer Jacob Corbitt arrived with his drug dog. Shutt saw the dog bark and scratch at the vehicle, which he understood, based on his prior experience with a K-9 unit, was a positive alert for narcotics.[1] On that basis, the agents then proceeded to search the car. They found a police scanner set to monitor the DEA frequency, as well as two driver's licenses bearing Coats's picture but other people's names.

As the officers searched the vehicle, Shutt noticed that Coats was turning away from officers in what appeared to be an attempt to conceal a weapon. When Shutt asked Clasing if Coats had been patted down, Coats turned his body further away from the officers. Shutt promptly patted Coats down and found a .40 caliber handgun in a holster on Coats's right hip. The officers

---

[1] Officer Corbitt did not recall details about the call and specifically did not remember whether his dog had alerted.

5

informed Coats of his Miranda rights and searched him incident to an arrest. The search revealed $7,000 on Coats's person, including $5,000 in one of his socks. Coats told the officers that the firearm was registered and that he was allowed to keep it in his business.

Shutt and several other agents then traveled to the Waterfront Marriott Hotel and proceeded to Room 943, the room identified as Coats's by hotel security.

Clasing heard a television on in the room as he approached. Shutt knocked on the door, and appellant Cavazos answered and put his hands up. Shutt pushed Cavazos aside, entered the room, and conducted a protective sweep. The officers did not conduct any further search of the room, however. While inside, Shutt observed several heat-sealed wrapped packages in plain view. Believing them to be drugs, he exclaimed, "We got kilos!" J.A. 243 (internal quotation marks omitted). Upon hearing that exclamation, Cavazos blurted out "No, no, no. No drugs. No drugs. I'm just the money man. I'm just the money man." J.A. 243 (internal quotation marks omitted).

Cavazos was arrested and given Miranda warnings. He told officers that there was about $200,000 in the room, and "the Jamaican[]" – which the officers understood to refer to Coats – had the rest of the money. J.A. 244. Cavazos also stated that the drugs "are not here yet, I count the money and make sure

6

that it is good." J.A. 693 (internal quotation marks omitted). After being read his Miranda rights, Cavazos produced a Texas driver's license, and Shutt instructed Lunsford to check for a vehicle with Texas plates in the hotel's parking garage. Lunsford located a Dodge Caravan with Texas plates and determined that it was registered to Crystal Cavazos. A drug dog subsequently alerted to narcotics in the Caravan.

While Lunsford secured the hotel room, other officers prepared an affidavit for a search warrant. The affidavit described the telephone call and meeting between Brown and the C.I. and recounted the basis for the informant's knowledge that Brown was selling heroin. It described the meeting between Brown and Coats, as well as the agents' surveillance of Coats's drive to the Marriott. The affidavit included Coats's representation that that he had not been to the Marriott that day and mentioned the police scanner, fake licenses, firearm, and currency. The affidavit also noted that Coats had rented Room 943 and that Cavazos was in the room, and described the statements Cavazos gave to the agents. The affiant stated that Lunsford had found the Dodge Caravan registered to Crystal Cavazos in the Marriott's garage and a drug dog had alerted for narcotics in the van. Shortly before noon on April 28, 2009, a Maryland state-court judge signed a warrant authorizing searches

7

of Room 943, the cell phone store, the Dodge Caravan, and 1112 Harwall Road.[2]

When they executed the warrants, the officers recovered: (1) $274,000 in cash in heat-sealed plastic bags, a heat-sealer machine and bags, a money counter, cell phones, and a tally sheet from Room 943; (2) a suitcase with $337,482 in cash from the Dodge Caravan; (3) $16,520 in cash, paperwork, heat-sealer bags, and a gun magazine from the cell-phone store; and (4) 410 grams of cocaine, 238 grams of heroin, a bag of gel capsules, a gel capper press, scales, a metal strainer and spoon, and a cell phone from 1112 Harwall Road.

On February 17, 2010, Cavazos, Coats, Brown, and James Bostic were charged in a five-count superseding indictment. All of the defendants were charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, 1,000 kilograms or more of marijuana, and five kilograms or more of cocaine. See 21 U.S.C. § 846. Coats was charged in Count Three with possession of a firearm in furtherance of a drug trafficking crime. See 18 U.S.C. § 924(c). Brown and Bostic were charged in Counts Two, Four,

---

[2] 1112 Harwall Road was the address of a residence officers observed Brown travel to shortly before he sold narcotics to the C.I. in a controlled buy.

8

and Five with other crimes.  Brown and Bostic pleaded guilty prior to trial.

Also prior to trial, Coats and Cavazos moved to suppress the evidence and statements obtained as a result of the interaction Coats had with the officers outside the cell-phone store and as a result of the searches of Coats's vehicle and Room 943.  As is relevant here, Defendants specifically argued that the interaction the officers had with Coats was an illegal seizure and that the initial entry into Room 943 was a warrantless entry not justified by exigent circumstances.  They further maintained that when the evidence obtained as a result of the illegal searches and seizures is stripped from the affidavit on which the search warrant was based, the remaining facts do not establish probable cause.  The district court held a suppression hearing at which Shutt, Clasing, Ostrow, and others testified.  After the hearing, the district court denied the defendants' motions, concluding, as is relevant here, that the seizure of Coats was a valid <u>Terry</u> stop and that exigent circumstances justified the initial entry into Room 943.[3]  <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

---

[3] Shutt testified at the suppression hearing that Coats was arrested near an "open-air drug market," people were in the area, and he was concerned that someone on the street had seen the arrest and alerted Coats's co-conspirators so that they could begin destroying evidence inside Room 943.  J.A. 237. (Continued)

9

A jury trial commenced that same day. Consistent with the numbering in the indictment, the jury verdict form listed Count One as the conspiracy charge. However, with Brown and Bostic having pleaded guilty prior to trial, the form listed Count Two as the firearm charge against Coats.

The jury found Cavazos and Coats guilty of conspiracy to distribute and possess with intent to distribute cocaine and noted on the special verdict form that five kilograms or more were foreseeable to both Defendants. The jury also found Coats guilty of possession of a firearm in furtherance of a drug trafficking crime.

Two months after the trial, the government provided the Defendants with FBI Forms 302 ("the 302s"), which the government had not produced previously. The 302s reported on a series of four pretrial interviews with prosecution witness Alex Mendoza-Cano ("Cano") that occurred from December 11, 2009, through April 28, 2010. Cano had been charged in a different district with intent to distribute five kilograms or more of cocaine, and he testified at Defendants' trial pursuant to a cooperation

Clasing and Shutt also testified that Room 943 was located in a narrow hallway, which created a "fatal funnel," meaning there was no cover or concealment if the officers tried to wait outside the room while a search warrant was obtained. J.A. 101, 238, 239.

agreement. The government relied on testimony from Cano and Brown to establish the existence of the drug conspiracy and its scope. Cano testified that he was a member of the Gulf Cartel, which was a Mexican drug trafficking organization, and that he was charged with overseeing the cartel's distribution operation in Houston. He testified in detail that he provided drugs to Cavazos, who in turn transported them to Baltimore for Coats and co-defendant Bostic. Prosecutors had received the 302s from the FBI only after the trial had ended and had produced them promptly thereafter. Defendants moved unsuccessfully for a new trial based on the government's alleged untimely production of the 302s. See United States v. Cavazos, 2011 WL 4596050 (D. Md. 2011).

The district court subsequently sentenced Cavazos and Coats to 540 months each on the conspiracy count and sentenced Coats to a consecutive term of 60 months on the firearm count.

II.

Defendants first argue that the district court erred in denying their suppression motions. In reviewing the denial of a motion to suppress, we review the district court's legal conclusions de novo while reviewing its factual findings for clear error. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

A.

Regarding the suppression motion, Defendants first contend that the officers illegally seized Coats when they approached him after he emerged from the cell-phone store. We disagree.

An officer is entitled to stop and briefly detain a person for investigative purposes when there is reasonable suspicion that criminal activity is afoot. See Terry, 392 U.S. at 30. Even assuming that the officers seized Coats as soon as they approached him, that seizure constituted a valid Terry stop. As the district court explained,

> Officer Shutt observed the phone call and meeting between the confidential informant and Brown, and learned that Brown planned to make a large "move." Officers observed the exchange of packaged money between Coats and Brown shortly after the informant's meeting, and learned that Coats was driving a rental vehicle – a common practice of drug dealers. Officers watched Coats bring the packaged money to the hotel and go to the cell phone store after 10:30 p.m. He left with bags at around 1:30 a.m. Under the totality of the circumstances, the officers had reasonable suspicion that Coats was engaged in drug trafficking.

J.A. 492-93. Defendants do not charge that the district court clearly erred in making any of the factual findings on which the district court's decision was based. They do contend that some of these facts are not suspicious when viewed in isolation. The pertinent question, however, is whether the facts, "[t]aken together, . . . sufficed to form a particularized and objective basis" for stopping Coats, United States v. Arvizu, 534 U.S.

12

266, 277-78 (2002) (emphasis added), and for the reasons explained by the district court, they certainly did.

B.

The Defendants next maintain that the district court erred in refusing to suppress the evidence obtained as a result of the search of Room 943. Defendants contend that the officers' initial warrantless entry into Room 943 was unjustified, that no evidence obtained as the result of that entry could be used to justify issuance of the search warrant, and that without such evidence the application did not establish probable cause. We disagree.

To authorize issuance of a warrant for search or seizure, a supporting "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause" in light of the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 239 (1983). "[T]o establish probable cause, the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)); see Florida v. Harris, 133 S. Ct. 1050, 1055 (2013). In determining whether an application establishes probable cause, a judicial officer must consider "the facts and circumstances as a whole and make a common sense

13

determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. (quoting Gates, 462 U.S. at 238). A warrant is not invalidated by the inclusion in the application of improperly obtained evidence so long as there is sufficient untainted information to support a finding of probable cause. See United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993).

Even assuming that the officers' warrantless entry into Room 943 was not authorized and thus that the evidence obtained as a result of that entry could not be used in support of a search-warrant application, the other facts in the affidavit nonetheless supported a search of Room 943. The only information derived from the warrantless entry that was included in the application was Cavazos's statement and the resulting drug-dog scan of his family's van in the parking garage. Even if that information is not considered, the affidavit is sufficient to establish probable cause.

The facts establishing probable cause include the following. Brown sold heroin to a confidential source only days prior to April 27, 2009. The source told Shutt on April 27 that Brown had told the source that Brown would be receiving a large

amount of narcotics shortly.[4]  Brown met with Coats that evening,
and the officers saw Brown give Coats what they believed to be
money.  Coats then immediately drove to the Waterfront Marriott,
entered the hotel — in which he had rented Room 943 — and left,
all within 30 minutes.  Coats then immediately drove to the
cell-phone store, which was closed, and left the store
approximately one hour later.  Coats falsely denied to law
enforcement that he had not gone to the Marriott that night.  A
drug dog alerted to the presence of narcotics in Coats's
vehicle.  Coats was carrying a loaded firearm on his person,
$7,000 cash, and two fake licenses.  And finally, Coats had a
police scanner tuned to the frequencies of the Baltimore Police
and the DEA.

Clearly, this information would have justified a reasonable
belief that Brown had given Coats money as part of a drug
transaction.  Considering that Coats had rented a room at the
Marriott and that he briefly visited the hotel after meeting
with Brown, the officers had reason to believe that Coats was
using the hotel room to further the transaction and that

_____

[4] The affidavit stated that the confidential informant had
passed on that Brown "had informed him/her that he had just
received a large amount of heroin and cocaine."  J.A. 689.
However, Shutt testified at the suppression hearing that his
confidential informant had told him that Brown would be
obtaining a large amount of narcotics later that evening.

15

evidence of the crime, whether it be the money Brown had given Coats, the drugs Coats was to give Brown, or other evidence, would be in the hotel room.

### III.

Defendants next argue that the district court erred in its handling of the verdict sheet presented to the jury. They note that Count Two of the superseding indictment charged Brown with distribution of a quantity of cocaine and that Count Three of the superseding indictment charged Coats with possession of a firearm in furtherance of the Count One conspiracy. They argue that the district court asked the jury to return a verdict as to Coats regarding only Counts One and Two and did not ask the jury to return a verdict on Count Three. They contend that since the jury returned guilty verdicts against Coats on Counts One and Two but Coats was not charged in Count Two, the finding of guilt on Count Two was a nullity, and because the jury was not asked to return a verdict on Count Three, the discharge of the jury without any finding of guilt on that charge operated as an acquittal on the firearm charge.

Because neither Defendant objected to the verdict sheet prior to the announcement of the jury's verdict, we review their objections for plain error only. See Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention").

16

Before we can consider reversing an error under plain-error review, "(1) there must be an error; (2) the error must be plain, meaning obvious or clear under current law; and (3) the error must affect substantial rights." United States v. Wallace, 515 F.3d 327, 332 (4th Cir. 2008). Even if these elements are established, however, "[t]he decision to correct the error lies within our discretion, and we exercise that discretion only if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" United States v. Massenburg, 564 F.3d 337, 343 (4th Cir. 2009) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).

Here, the record makes clear that the district court correctly interpreted the jury's verdict. The court instructed the jury that "Count 2 of the Indictment charges Defendant Wade Coats with possessing a firearm during and in relation to a drug-trafficking crime; specifically, conspiracy to distribute and possess with intent to distribute cocaine." J.A. 482. When the jury returned with its verdict, the courtroom deputy asked the jury foreman, "How do you find Defendant, Wade Coats, as to Count 2, possession of a firearm in furtherance of a drug-trafficking crime?" J.A. 483. The foreman responded, "Guilty." J.A. 483. The jury also recorded on its verdict form that it found Coats guilty of Count Two, "possession of a firearm in furtherance of a drug trafficking crime." J.A. 500. It is thus

17

apparent that, in light of Brown's guilty plea, the district court simply renumbered the charges from the superseding indictment and the jury found Coats guilty of the very crimes of which the district court adjudicated him guilty. Accordingly, there was no error, and certainly no plain error.

IV.

Defendants also maintain that the district court abused its discretion in refusing to grant the Defendants a new trial based on the late disclosure of the 302s. We disagree.

We review a district court's denial of a new trial motion for abuse of discretion. See United States v. Moore, 709 F.3d 287, 292 (4th Cir. 2013); United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001). Applying this standard, we "may not substitute [our] judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995).

Defendants first maintain that a new trial was warranted because the 302s constituted Jencks Act material. The Jencks Act requires the government to disclose to a defendant statements made by a witness relating to the subject matter of the witness's direct examination. See 18 U.S.C. § 3500(b). The notes of a government agent who has interviewed a witness do not

18

constitute the witness's "statements" in this context unless the witness has adopted those notes or the notes recite the witness's oral statements substantially verbatim. See United States v. Roseboro, 87 F.3d 642, 645 (4th Cir. 1996). Mere occasional inclusion by the agent of the witness's verbatim words do not make the agent's notes the witness's "statements" in this context. See Palermo v. United States, 360 U.S. 343, 352–53 (1959).

Notwithstanding Defendants' argument that the 302s constituted Jencks material, the reports were not written or adopted by Cano, nor did they purport to be a substantially verbatim account of Cano's statements. Rather, they were simply agents' summaries of the substance of Cano's statements. Thus, the district court correctly ruled that they were not required to be produced under the Jencks Act.

Defendants also contend that the government was required to produce the 302s under Brady v. Maryland, 373 U.S. 83 (1963). Under Brady, the government is required by the Fifth Amendment's Due Process Clause to disclose material evidence favorable to the defendant, including impeachment evidence. See United States v. McLean, 715 F.3d 129, 142 (4th Cir. 2013). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Curtis,

931 F.2d 1011, 1014 (4th Cir. 1991) (internal quotation marks omitted). In this context, a reasonable probability "is one that is sufficient to undermine confidence in the outcome of the proceeding." Richardson v. Branker, 668 F.3d 128, 145 (4th Cir. 2012).

Defendants argue that the 302s were material under the theory that defense counsel could have much more effectively cross-examined Cano had the 302s been disclosed. Defendants maintain that Cano at least implied in his testimony that he was not involved in violence as part of his job, and they contend that the 302s would have contradicted this representation. For this reason, they submit that the government's failure to turn these materials over in a timely manner undermines confidence in the outcome of the trial.

Not only did the denial of Defendants' new-trial motion not constitute an abuse of discretion, but its decision was clearly correct. Defendants cite passages from Cano's testimony that they maintain contradict material contained in the 302s. The 302s did not directly contradict any part of Cano's testimony, however, and they certainly did not contradict any testimony regarding the actions of the Defendants.

Defendants first argue that the 302s contradict testimony by Cano that he never shot at police officers. The 302s were quite consistent with Cano's testimony on this point, however.

20

Cano admitted in his testimony before the jury that he was part of a very violent business. Cano specifically admitted that he was wanted by the Honduran police because "[w]e did the business that turned out bad on us. There were dead people that came out of that. . . . The cartel had an entire family eliminated." J.A. 444. He also indicated in his testimony that the cartel had killed employees who had cooperated with the government and killed their families as well. He further testified that he was "involved in a shootout between [his] cartel and the police of the country of Honduras" that left him injured. J.A. 445; see also J.A. 446-47 (Cano's testimony admitting he "ha[d] a shootout with" the police). The 302s reference this shootout but do nothing to contradict Cano's testimony as to Cano's role in it.

Defendants also note that the 302s indicated that Cano had extensive training and skills in violent activities and that he had committed many violent acts in the past, including murdering several people. In this respect, Defendants also point to testimony from Cano that dealing drugs, rather than killing people, was his business. If confronted with the 302s, however, the government could have persuasively argued that there was no significant tension between the 302s and Cano's testimony insofar as the context for the statement Defendants highlight was that Cano was explaining why he fled Mexico to come to the

21

United States. Indeed, it appears he was merely explaining that his primary business was selling drugs and noting that any involvement in violence was only incidental. And even to the extent that defense counsel were able to persuade the jury that Cano was unfairly downplaying his role in the cartel's violence, there is no reason to believe that defense counsel could have used the 302s to any material advantage.

This is especially true because defense counsel was quite effective, without the 302s, in impeaching Cano. He testified at length about how he had repeatedly engaged in illegal activity for years and admitted his willingness to lie when it served his interests. Although he testified that he would not lie under oath, his testimony made clear that his foremost concern was helping his family and that he was cooperating with the government in hopes of obtaining a shorter sentence. Thus, the jury had strong reason to conclude that he would testify falsely if he believed it would accelerate his return to his family. We find no reason to believe that the 302s would have enabled defense counsel to cast any significant further doubt on the truth of Cano's testimony concerning the existence and scope of the conspiracy. Accordingly, we conclude that the district court was well within its discretion in concluding that the government's tardy production of the documents did not undermine confidence in the jury verdicts.

22

V.

Finally, Cavazos and Coats both challenge the substantive reasonableness of their sentences.

We review a sentence for reasonableness "under a deferential abuse-of-discretion standard." Gall v. United States, 552 U.S. 38, 41 (2007). This review requires us to consider both the procedural and substantive reasonableness of a sentence. See id. at 51; United States v. Lynn, 592 F.3d 572, 575 (4th Cir. 2010). As part of our procedural review, we consider whether the district court considered the 18 U.S.C. § 3553(a) factors. See Gall, 552 U.S. at 51. In this regard, the district court "must place on the record an individualized assessment based on the particular facts of the case before it." United States v. Carter, 564 F.3d 325, 330 (4th Cir. 2009) (internal quotation marks omitted). However, the court is "not required to provide a lengthy explanation or robotically tick through § 3553(a)'s every subsection." United States v. Chandia, 675 F.3d 329, 341 (4th Cir. 2012) (internal quotation marks omitted). Rather, it need only "set forth enough to satisfy" us that it "has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356 (2007).

Here, Defendants do not cite any procedural error, and we do not find one.  The district court explicitly considered both Defendants' age, lack of criminal history, and personal background.  The court also found that over 1,500 kilograms of cocaine was foreseeable in the context of the conspiracy to distribute and possess with intent to distribute.  In light of "the duration and extent of the criminal enterprise as measured in time . . . as well as in drugs and money," the district court determined that the sentences imposed were sufficient but not greater than necessary to accomplish the goals that § 3553(a) sets out.  J.A. 624.  We find the court's analysis to be sound and certainly no abuse of discretion.

## VI.

In sum, finding no error, we affirm Defendants' convictions and sentences.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

<u>AFFIRMED</u>

24